IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | : | |
|---|---|---|
| **EEDW LLC,** *et al.*, | : | CIVIL ACTION |
| | : | |
| Plaintiffs, | : | |
| v. | : | |
| | : | |
| **BANK OF AMERICA, N.A.,** | : | NO. 2:22-cv-02648 |
| | : | |
| Defendant. | : | |

**Perez, J.**                                                                                               **May 31, 2024**

<u>**MEMORANDUM**</u>

Presently before the Court are cross motions of the parties. Plaintiffs EEDW LLC ("EDDW"), BDDW Design LLC ("BDDW Design"), BDDW Studio LLC ("BDDW Studio"), and Ted Tyler Hays (collectively, "Plaintiffs") move to dismiss Defendant Bank of America's counterclaims. In response, Defendant asks this Court to dismiss Plaintiffs' complaint in a motion for judgment on the pleadings. For the reasons that follow, this Court will grant in part and deny in part various requests made by both sides.

**I.      BACKGROUND**

In 2017, Defendant extended a $1,250,000 commercial line of credit ("LOC") to Plaintiff EDDW that was originally set to mature in January of 2018. The parties subsequently renegotiated and extended the maturity date of the loan several times. ECF No. 10 ¶¶ 2-3; ECF No. 24-1 at 6-7. Plaintiffs aver, though Defendant disputes, that EDDW never missed a single payment on the loan, even during the COVID-19 pandemic. ECF No. 10 ¶¶ 3-4; *but see* ECF No. 20 ¶¶ 3-4. Eventually, the LOC was converted into a term obligation, and while the parties dispute the reason behind the conversion, it is clear that EDDW had not paid the balance by August 31, 2021. The parties spent several weeks negotiating the conditions for termination and eventually agreed to

extend the loan through March 31, 2022, provided that EDDW remit a good faith payment of $150,000 by October 29, 2021. ECF No. 10 ¶¶ 5-7; ECF No. 24-1 at 7.

On October 21, 2021, Defendant's representative, Senior Vice President Carmen Bruce, wrote a follow-up email to Plaintiffs' counsel memorializing the terms of the agreement:

> *Bank of America is requesting EDDW to pay off its $1,050,000 loan as outlined below:*
> • *Immediate good faith pay down of $150,000 by 10/29/21 (last business day of the month)*
> • *After receipt of the good faith payment, we will extend the maturity of the loan to 3/31/21.[1]*
> • *The remaining balance of $900,000 to be paid no later than 3/31/21 (e.g. 3 payments of $300,000 each) . . .*

ECF No. 24-10.

On October 27, 2021, prior to remitting the $150,000 good faith payment, counsel for Plaintiffs responded:

> *Sorry for delay, I am waiting to hear from Tyler and will let you know by 10/29 as you requested.*
> *Just to be clear and I read your other email, but if we make that payment by EOD Friday, BOA will extend the maturity of the loan to 3/31/21, correct? And then we would need to pay off the remaining $900K by then?*

ECF No. 24-12.

Later that day, Defendant's representative responded via email, confirming:

> *The $150,000 payment has to be made the latest 10/29 and we will then renew the line until 3/31/22. You will then have to pay the balance of $900,000 by 3/31/22.*

ECF No. 10 ¶ 11.

As agreed by the parties, Plaintiffs made the $150,000 good faith payment to Defendant on October 29, 2021. *Id.* ¶ 45. Two weeks later, Defendant's representative sent an email that read:

---

[1] It is the Court's understanding that there is a typo in this email and that the parties agree the revised maturity date of the loan was March 21, 2022 rather than 2021.

> *This is a reminder that EDDW is required to provide us with **three $300,000 payments** to fully pay off the loan. Please let me know the timing of the next payment.*

*Id.* ¶ 47 (emphasis added).

Counsel for Plaintiffs immediately responded to Ms. Bruce, stating that Plaintiffs had never agreed to any particular payment schedule beyond the initial good faith payment and overall balance due at the end of March 2022:

> *We paid you $150K two weeks ago to extend the line until the end of March 2022, at which time the remaining $900K is due. No part of that required three specific payments of $300K each, unless I'm missing something? In fact, I asked you to confirm what the deal was and this is what you emailed me: Correct, the $150,000 payment has to be made by the latest 10/29 and we will then renew the line until 3/31/22. You will then have to pay the balance of $900,000 by 3/31/22.*

*Id.* ¶ 48.

Counsel for Plaintiffs did not receive a response to his October 29th reply email. On December 6, 2021, Defendant sent "Renewal Documents" directly to Plaintiffs' owner Tyler Hays, followed by an email to Plaintiffs' counsel informing him that Mr. Hays was to provide an e-signature. The Renewal Documents were not directly sent to Plaintiffs' counsel. Tyler Hays executed the documents the following day, without knowledge that the written agreement included a specific payment plan provision requiring monthly payments of $228,469. *Id.* ¶ 49-51; ECF No. 21-1 at 6-7. Within minutes of Hays' execution, counsel for Plaintiffs' realized that this payment plan provision was part of the written agreement, and immediately wrote to Ms. Bruce:

> *Tyler signed those docs, but can you please ignore those copies and resend him versions that do not include the repayment schedule in it? After he signed, I noticed you slipped in a paragraph requiring four equal payments. Respectfully, while that is certainly how we hope to pay this off, those are not the terms I confirmed with you via email.*

*Id.* ¶ 50.

Ms. Bruce responded:

*We are requesting three partial payments as indicated on my previous emails The remaining balance of $900,000 to be paid no later than 3/31/21 (e.g. 3 payments of $300,000 each)*

Id. ¶ 53.

Counsel for Plaintiffs replied:

*. . . e.g. means "for example." It is far from a binding term. You could have also written (e.g., 2 payments of $450K each) or (e.g., 1 payment of $900K) and the sentence would have literally the exact same meaning as how you wrote it. When I asked you to specifically confirm the terms of our deal, this is what you said: Correct, the $150,000 payment has to be made the latest 10/29 and we will then renew the line until 3/31/22. You will then have to pay the balance of $900,000 by 3/31/22. You made no mention in that email of the 3 payments you reference below and it was only after that email that I sent you the $150K. Slipping a term into this that we did not previously agree to and, in fact, specifically took issue with is not exactly dealing with us in good faith. Again, I ask that you resent that with the repayment term provision altered/removed.*

Id. ¶ 54.

Defendant did not respond. Three weeks later, Defendant attempted to withdraw $228,469.49 from Plaintiff EDDW's checking account but was unsuccessful due to insufficient funds. *Id.* ¶ 57. On January 4, 2022, Ms. Bruce wrote to Plaintiffs' counsel:

*Your first loan payment in the amount of $228,469.49 is past due. Please let me know when you are funding the account to make this payment.*

Id. ¶ 58.

On January 11, 2022, Plaintiffs' counsel responded:

*Let me discuss with Tyler and will get back to you ASAP. But as a general matter, I refer to you to my email from December 7th where I asked you to resend us a copy of the agreement that actually reflects what we agreed to regarding the payment schedule. Again, the loan will be paid off by 3/31/21, as we agreed. The insertion of this payment schedule in the document you sent to Tyler was not something we agreed to, however. In fact, the only payment schedule you even proposed was 3 payments of $300K, which is not only something we did not agree to but also not the payment schedule included in the documents you sent to Tyler, so I hope you can understand our confusion here.*

*Id.* ¶ 59.

The parties participated in a conference call on January 21, 2022, but did not resolve the dispute surrounding the payment plan provision. Defendant subsequently attempted to withdraw two more payments from EDDW's account but was unsuccessful. On February 18, 2022, Defendant sent a revised agreement that did not contain any payment schedule beyond the requirement that Plaintiff pay the loan off in full before March 31, 2022. ECF No. 24-1 at 31. Plaintiff Hays did not execute the revised agreement.[2]

On June 10 2022, Plaintiffs filed suit in Philadelphia Court of Common Pleas, raising the following claims against Defendant: intentional and negligent misrepresentation; breach of the implied covenant of good faith and fair dealing; conversion; unjust enrichment; and a violation of the New York General Business Law. On July 7, 2022, Defendant removed the matter to federal court. In response to Plaintiffs' amended complaint, Bank of America filed counterclaims seeking collection of the outstanding amounts owed by Plaintiffs, enforcement of its security interest, and alleging breach of contract and unjust enrichment.

## II.   LEGAL ANALYSIS[3]

### A. Plaintiffs' Claims Against Defendant

Plaintiffs argue they were induced into sending the good faith payment and executing the "Renewal Documents," (hereinafter referred to as the "term loan agreement") through the

---

[2] Defendant asks the Court to question the motives behind Plaintiffs' refusal to sign. In defense of their refusal, Plaintiffs aver that Defendant was not negotiating in good faith. Plaintiffs contend that "during the time the parties were supposed to be negotiating in good faith, Defendant was simultaneously trying to drain Plaintiff EDDW's bank account (and, thus, attempting to put Plaintiff EDDW out of business) by unilaterally attempting to withdraw a total of $1,370,816.94." ECF No. 10 ¶ 59.

[3] The parties agree that the substantive laws of the State of New York shall apply in this case pursuant to both the term loan agreement and the preceding LOC agreement.

fraudulent and/or negligent practices of Bank of America. Plaintiffs contend that they never agreed to make interim monthly payments and that Defendant deliberately snuck that provision into the term loan agreement without notice to EDDW or its counsel. In Defendant's version of events, Bank of America properly advised EDDW of its obligation to remit interim monthly payments and reiterated this requirement via email prior to Hays' execution. Defendant concludes that this lawsuit amounts to nothing more than Plaintiffs' attempt to delay or avoid their obligation to repay the debt. This Court finds, generally, that Bank of America misrepresented to Plaintiffs what the terms of the loan conversion would be and provided false information about the status of the loan and what was required to extend it.

### 1. Count One: Intentional Misrepresentation

Plaintiffs argue that Defendant intentionally misrepresented that:

1.) the terms of the payment schedule consisted solely of making the good faith payment and paying the remainder off by the end of March 2022;

2.) the written term loan agreement sent to Plaintiff Hays memorialized those terms and nothing else; and

3.) it would act in good faith in its dealings with Plaintiffs.

Plaintiffs argue that they have sufficiently pled facts showing intentional misrepresentation based on Defendant's dishonest communications and practices employed during the months-long negotiations over how to convert the LOC into a revised term loan agreement. The elements for intentional or fraudulent misrepresentation are: (1) a material misrepresentation by a defendant; (2) made with the intent to defraud a plaintiff; (3) a plaintiff's reasonable reliance on the misrepresentation; and (4) a plaintiff suffers damage as a result of her reliance. *Swersky v. Dreyer & Traub,* 643 N.Y.S.2d 33, 36 (1st Dept. 1996). Under New York law, a claim for intentional misrepresentation is analytically identical to a claim for fraud. *FDIC v. US Mortg. Corp.*, 132 F.

Supp. 3d 369, 382 (E.D.N.Y. 2015). General allegations that a defendant entered into a contract with the intent not to perform are insufficient to support a fraud claim. *New York Univ. v. Continental Ins. Co.,* 87 N.Y.2d 308, 318 (1995).

For a false representation to give rise to a cause of action based on fraud, reliance on the false representation must result in injury, and if the fraud causes no loss, then the plaintiff has suffered no damages. *Connaughton v. Chipotle Mexican Grill, Inc.*, 29 N.Y.3d 137, 142 (2017). "The true measure of damage is indemnity for the actual pecuniary loss sustained as the direct result of the wrong' or what is known as the 'out-of-pocket' rule." *Lama Holding Co. v. Smith Barney, Inc.*, 88 N.Y.2d 413, 421 (1996) (quoting *Reno v. Bull,* 226 N.Y. 546, 553 (1919)).

The alleged misrepresentation in this case concerns Carmen Bruce's statements to Plaintiffs prior to Hays' execution in which she assured Plaintiffs' counsel that no timetable for repayment was required. Plaintiff contends that Ms. Bruce intentionally misrepresented that all that was needed to "renew the line until 3/31/22" was a $150,000 good faith payment to "be made the latest 10/29" and that EDDW "will then have to pay the balance of $900,000 by 3/31/22." ECF No. 10 ¶ 11. Plaintiff argues that at the time Ms. Bruce made that statement in writing, she was aware that she was going to subsequently demand monthly payments and that any failure to remit monthly payments would be considered a default. She was likewise aware that Defendant intended to automatically debit Plaintiff EDDW's bank accounts for these payments. Had Ms. Bruce notified Plaintiffs' counsel of these expectations during the repayment negotiations, Plaintiffs never would have agreed to such terms.

Defendant avers that "Bruce's October 21, 2021 email clearly and unequivocally set[] forth the requirement that EDDW make three (3) interim monthly payments of approximately $300,000,

an obligation which the parties formalized in the Term Loan Documents." To review, Bruce's October 21, 2021, email read, in pertinent part:

> Immediate good faith pay down of $150,000 by 10/29/21 (last business day of the month); After receipt of the good faith payment, we will extend the maturity of the loan to 3/31/21 [sic]; The remaining balance of $900,000 to be paid no later than 3/31/21 [sic] **(e.g. 3 payments of $300,000 each)** (emphasis added).

The inclusion of the parenthetical "e.g." amounts to nothing more than a suggestion and cannot be said to "clearly and unequivocally" communicate that Defendant was mandating a specific payment plan. Moreover, the email correspondence that followed did not include any mention of scheduled payments beyond the initial $150,000 and requirement that the loan be paid off by the end of March. Prior to remitting the good faith payment, counsel for Plaintiffs expressly confirmed that there were only two deadlines expected: $150,000 by 10/29/21 and the remaining debt by 3/31/22, which Ms. Bruce verified. Plaintiffs anticipated that no further payment was required before the loan became due in full at the end of March. Plaintiffs have sufficiently alleged they reasonably relied on this misrepresentation, which induced Hays to remit the good faith payment and to overlook the inclusion of this provision in the written instrument ultimately presented to Hays for his execution. Plaintiff Hays would never have signed the term loan agreement if he knew it contained a timetable provision. This is evidenced, in part, by Plaintiffs' counsels' immediate objection to that provision upon realization.

When given the opportunity to reiterate or further specify the payment plan Defendant expected, Ms. Bruce declined to do so in any follow-up correspondence after the inclusion of the "e.g." parenthetical. That email had merely proposed a possible *example* of how the payments could be made and can hardly be construed as a payment plan for specific dates and amounts. It was not until over a month later that Defendant sent any formal written instrument to Plaintiff. Until that point, Plaintiffs counsel had made it abundantly clear that they had no intention of

making interim payments before the entire loan became due at the end of March. Nevertheless, Defendant included a precise payment plan provision, to which the parties had never agreed, in the written agreement sent to Hays. Defendant attempted to accelerate Plaintiffs' repayment without their consent.

Defendant argues that Plaintiffs' remittance of the good faith payment cannot constitute harm in this case since the bank applied that $150,000 payment to Plaintiffs' outstanding debt. However, damages in a fraud case are to be calculated for what a plaintiff lost because of the fraud. This is not a situation where Plaintiffs are asking for compensation for what they *might* have gained in the future, which would be improper. However, to be sure, Plaintiffs have not presented the most compelling case for injury beyond remittance of the good faith payment and being overcharged by Defendant.[4] Defendant's failed attempts to debit Plaintiffs' account did not result in any actual loss to Plaintiffs since the money was never taken out—perhaps these failed transactions resulted in fees or other damage to Plaintiffs, but none are explicitly pled.

Instead, Plaintiffs contend that as a direct and proximate cause of Defendant's actions, Plaintiffs have suffered damages including the overcharged payment, business disruptions, attorneys' fees, costs, and expenses. Accepting all of Plaintiffs' factual averments as true, this Court finds an actionable fraud induced payment here, which was a pecuniary loss to Plaintiffs.

### 2. Count Two: Negligent Misrepresentation

The elements of a claim for negligent misrepresentation are: (1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) the information was incorrect; and (3) reasonable reliance on the information. *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 180 (2011). "'[L]iability for negligent

---

[4] Plaintiffs do not elaborate on the allegation that they were over charged by Defendant.

misrepresentation has been imposed only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified.'" *Fresh Direct, LLC v. Blue Martini Software, Inc.*, 7 A.D.3d 487, 489 (2d Dept. 2004) (quoting *Kimmell v. Schaefer*, 89 N.Y.2d 257, 263 (1996)). Notably, the relationship "requires a closer degree of trust than an ordinary business relationship." *Fleet Bank v. Pine Knoll Corp.*, 290 A.D.2d 792, 795 (3d Dept. 2002) (internal citation omitted). For this reason, arm's-length transactions between sophisticated parties do not give rise to privity. *Id.*

The requisite privity-like relationship only exists where one party "possesses unique or specialized expertise" or is "in a special position of confidence and trust with the injured party." *Mandarin Trading,* 944 N.E.2d at 1109. Without more, "[a] standard lender-borrower relationship is not the kind of special relationship that supports a claim of negligent misrepresentation." *Boniel v. U.S. Bank N.A.,* No. 12–CV–3809, 2013 WL 458298, at *4 (E.D.N.Y. Feb. 6, 2013) (citing *Dobroshi v. Bank of Am., N.A.,* 65 A.D.3d 882, 886 (App. Div. 2009)). It is well settled under New York law that generally a lender, such as such as Bank of America, is not in a fiduciary relationship with the borrower. *See Genna v. Sallie Mae, Inc.,* No. 11–CV–7371, 2012 WL 1339482, at *4 (S.D.N.Y. Apr. 17, 2012) ( "no [fiduciary] duty generally exists between a lender and a borrower" and that to establish such a relationship, a plaintiff must plead specific "facts to suggest that, despite the general rule, there exists in [his or her] case a fiduciary relationship based upon trust or confidence by one person in the integrity and fidelity of another." (internal quotations omitted)).

Having already determined that Plaintiffs reasonably relied on misrepresentations by Defendant, this Court will examine whether there is a special or privity-like relationship present. Defendant argues that the parties are sophisticated entities engaged in an arms-length commercial

transaction. Plaintiffs plead that their "reliance on Defendant's representations was justified because of Defendant's agents alleged superior knowledge in handling lines of credit and Plaintiffs' longterm [sic] relationship with Defendant. Specifically, Defendant's agents Carmen Bruce, a Senior Vice President of Commercial Banking at BOA, and Irina Sirota, a Market Executive for BOA, held themselves out as executives with authority to negotiate such matters." ECF No. 10 ¶ 104. Plaintiffs have not offered sufficient facts to demonstrate that Bank of America was more than an average arms-length lender beyond a boilerplate statement alleging Defendant's "superior knowledge." Therefore, Plaintiffs have failed to make out a negligent misrepresentation claim.

### 3. Count Three: Breach of the Implied Covenant of Good Faith and Fair Dealing

Plaintiffs argue Defendant breached its implied duty to deal fairly and in good faith by, in addition to the acts of misrepresentation addressed above, "engaging in actions purposefully aligned at frustrating and interfering with Plaintiffs' terms of payment; credit score; and liquid assets." ECF No. 10 ¶ 109. Defendant argues that the implied covenant of good faith and fair dealing is limited to performance under a contract and does not include negotiations between the parties. They further argue that Plaintiffs cannot use evidence of prior negotiations to challenge the terms of the written agreement. Bank of America argues that Plaintiffs cannot introduce evidence to contradict the terms of the written term loan agreement to form the foundation for their covenant of good faith and fair dealing claims. They argue that this claim is essentially a breach of contract claim that relies entirely on the prior emails, which would expressly contradict the written agreement.

"Under New York law, a covenant of good faith and fair dealing is implied in all contracts." *State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 170 (2d Cir. 2004)

(quoting *1-10 Indus. Assocs., LLC v. Trim Corp. of Am.*, 297 A.D.2d 630, 631(2d Dep't 2002). "This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* (internal quotation omitted). "[T]he implied obligation is in aid and furtherance of other terms of the agreement of the parties." *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 304 (1983). Accordingly, "[n]o obligation can be implied ... which would be inconsistent with other terms of the agreement of the parties." *Id.*

The elements of a claim for breach of the duty of good faith and fair dealing are: "(1) defendant must owe plaintiff a duty to act in good faith and conduct fair dealing; (2) defendant must breach that duty by acting in bad faith or failing to conduct fair dealing; and (3) the breach of duty must proximately cause plaintiff's damages." *Washington v. Kellwood Co.,* No. 5-cv-10034, 2009 WL 855652, at *6 (S.D.N.Y. Mar. 24, 2009) (quoting *Boyd v. University of Illinois*, No. 96-cv9327, 2001 WL 246402, at *10 (S.D.N.Y. Mar. 13, 2001)).

Plaintiffs have sufficiently alleged that Bank of America breached the duty to act in good faith and fair dealing by (1) misrepresenting the terms necessary to convert the LOC to a term obligation, which induced Plaintiff to make the $150,000 payment; and (2) intentionally attempting to deduct significant sums from Plaintiffs' account while the parties were continuing to engage in good faith negotiations. In this case, construing the facts in a light most favorable to Plaintiff, Defendant told Plaintiffs that there were no required payments between the time the good faith payment was rendered and when the entire loan became due at the end of March. The good faith payment itself was all that was needed to extend the loan. Without ever firming up a payment schedule or presenting Plaintiffs with a written instrument, Defendant sent a contract containing a payment plan provision directly to Plaintiff Hays with no explicit notice. Defendant sought to

enforce a term never agreed to in prior negotiations. Therefore, this Court will not dismiss the breach of the implied covenant of good faith and fair dealing claim.

### 4. Count Four: Conversion

To state a claim for conversion under New York law, a plaintiff must demonstrate that they have "legal ownership or an immediate possessory right superior to that of defendants" and that "the defendants exercised unauthorized dominion over the property to the exclusion" of the plaintiff's rights. *Sea-Land Serv., Inc. v. Remington Rand Corp.*, No. 84 Civ. 177 (LBS), 1986 WL 8862, at *5 (S.D.N.Y. Aug. 7, 1986), *aff'd sub nom*, *Sealand Serv. Inc. v. Remington Rand Corp.*, 812 F.2d 713 (2d Cir. 1987) (citing *Gold Medal Products, Inc. v. Interstate Computer Servs., Inc.*, 80 A.D.2d 600 (App. Div. 1981)). "[T]he wrongful exercise of dominion need not consist of a 'manual taking, on the defendants' part 'but can occur by the defendants' 'assuming to sell and dispose of [the property] as their own.'" *State v. Seventh Regiment Fund,* 774 N.E.2d 702, 710 (2002) (quoting *Pease v. Smith*, 61 N.Y. 477, 480-81 (1875)). "Some affirmative act—asportation by the defendant or another person, denial of access to the rightful owner or assertion to the owner of a claim on the goods, sale or other commercial exploitation of the goods by the defendant—has always been an element of conversion." *Seventh Regiment Fund*, 744 N.E.2d at 711.

According to Plaintiff, Defendant is liable to Plaintiffs for conversion related to the taking and keeping of the good faith payment. Plaintiffs have alleged that EDDW only sent the $150,000 good faith payment to Defendant based on its representations that nothing else was needed to extend the termination date of the LOC to the end of March 2022. Plaintiffs argue that after Defendant reneged on the original terms of agreement, it was under an obligation to return the good faith payment. Defendant responds that it credited EDDW's $150,000 good faith payment to the amounts already owed to Bank of America. There is no dispute between the Parties over the

amount owed by EDDW to Defendant. This Court agrees with Defendant that because Plaintiffs received full credit for the paydown of the LOC in the amount of $150,000, Plaintiffs' conversion claim cannot be sustained. Plaintiffs continue to enjoy ownership and control of the cash payment in the form of a credit against an undisputed outstanding debt amount. Remittance of the good faith payment by Plaintiffs, which covered a portion of their outstanding LOC balance, was not improperly possessed by Defendant despite the present dispute over the term loan agreement.

### 5. Count 5: Unjust Enrichment

In order to adequately plead a claim for unjust enrichment, Plaintiffs must allege "that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011). The basis of a claim for unjust enrichment is that the defendant has obtained a benefit which in "equity and good conscience" should be paid to the plaintiff. *Id.* Plaintiffs' unjust enrichment claim fails for the same reasons the conversion claim fails—Bank of America has not been enriched (unjustly or otherwise) by the $150,000 payment. Defendant has simply been repaid a portion of EDDW's outstanding LOC balance. The circumstances present here do not create an equitable obligation by Defendant to return the payment.

### 6. Count VI: Violation of New York General Business Law, § 349

To state a claim under Section 349, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct, that is (2) materially misleading, and that (3) the plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Koch v. Acker, Merrall & Condit Co.,* 18 N.Y.3d 940, 941 (2012) (internal citation omitted); N.Y. Gen. Bus. Law § 349. Section 349 requires that a plaintiff demonstrate that the defendant's deceptive acts were directed at consumers. *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000); *S.Q.K.F.C. Inc. v. Bell*

*Atl. Tricon Leasing Corp*., 84 F.3d 629, 636 (2d Cir. 1996); *Int'l Sport Divers Ass'n, Inc. v. Marine Midland Bank*, 25 F.Supp.2d 101, 114 (W.D.N.Y.1998). Business-to-business transactions therefore generally do not give rise to Section 349 claims. *See Exxonmobil Inter–Am. Inc. v. Advanced Information Eng'g Servs. Inc*., 328 F.Supp.2d 443, 448 (S.D.N.Y.2004).

However, New York courts have also held that Section 349 applies *broadly* to deceptive acts and practices aimed at consumers. *See Plavin v. Group Health Inc*., 35 N.Y.3d 1 (NY 2020); *Karlin v. IVF Am*., 93 N.Y.2d 282 (NY 1999); *Walker v. Town of Hempstead,* 84 N.Y.2d 360 (NY 1994). Moreover, "there is no textual support in General Business Law § 349 for a limitation on the definition of 'consumer' based on use. Indeed, any such narrowing of the term 'consumer' would be contrary to the legislative intent to protect the public against all forms of deceptive business practices." *Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co*., 171 N.E.3d 1192, 1197 (NY 2021) (internal citations omitted).

Defendant reiterates that Plaintiffs cannot establish that Bank of America engaged in any misleading or deceptive practice because it disclosed the terms and conditions of the LOC conversion to EDDW, memorializing the terms in a fully integrated agreement which EDDW and its counsel had the opportunity to review before executing. Defendant argues that Section 349 was intended to protect small-time individual consumers and not sophisticated commercial entities, such as EDDW. However, reviewing all the facts in the light most favorable to Plaintiffs, this Court finds that they have sufficiently pled that the practice employed by Defendant was "consumer-oriented" as required to bring a claim under Section 349. This Court agrees with Plaintiffs assessment that Plaintiff Hays is "undoubtedly a consumer." The question of whether Defendant has engaged in deceptive acts and practices beyond this private contract dispute is best explored after discovery.

### B. Bank of America's Counterclaims

Bank of America filed seven counterclaims "which seek collection of the outstanding amounts owed by Plaintiffs to [Defendant]" and to enforce Defendant's "security interest in the collateral securing [Defendant's] loan." ECF No. 24 at 5.

#### 1. Severability of the Payment Provision from the Term Loan Contract

At the outset, this Court finds that the payment provision timetable set forth in the term loan documents is severable from the overall contract. The main consideration for determining severability of a contract is "the intent of the parties as determined by a fair construction of the terms and provisions of the contract itself, by the subject matter to which it has reference, and by the circumstances existing at the time of contracting." *Mun. Capital Appreciation Partners, I, L.P. v Page*, 181 F Supp 2d 379, 394 (S.D.N.Y. 2002). Here, the contract expressly addresses severability of unenforceable terms. Section 6.5 of the Term Loan Agreement, titled "Severability; Waivers" provides, in relevant part, "[i]f any part of any Credit Document is not enforceable, the rest of the Credit Documents may be enforced." *Id.* at 32. This provision is identical to the one contained in the preceding LOC contract. ECF No. 24-8.

In Defendant's view, the term loan "imposed two (2) separate obligations on the EDDW – to make three (3) interim monthly payments towards the outstanding principal and interest; and to pay the remaining outstanding principal balance on or before March 31, 2022." ECF No. 24-1 at 32. While this Court finds that Plaintiffs have raised a plausible claim for the unenforceability of the payment plan provision, it is also true that "[i]f the Court severs the obligation to make monthly interim payments, the purpose of the Term Loan Documents – to have the Term Loan paid in full on or before March 31, 2022 – remains unchanged." *Id.*

### 2. Breach of Contract Claims

Defendant raises four breach of contract claims: two pertaining to the 2021 term loan agreement and two, in the alternative, concerning the 2020 LOC. To state a claim for breach of contract under New York law, a party must allege: (i) the existence of an agreement between the plaintiff and defendant; (ii) due performance of the contract by the party alleging the breach; (iii) a breach; and (iv) damages resulting from the breach. *R.H. Damon & Co. v. Softkey Software Prods., Inc.,* 811 F. Supp. 986, 991 (S.D.N.Y. 1993). Plaintiffs admit the existence of an agreement. ECF No. 26 at 28.[5]

Defendant has sufficiently pled that Plaintiffs breached their obligation to satisfy the overall principal and interest due on the term loan agreement by March 31, 2022. Therefore, Defendant's counterclaims concerning Plaintiffs' breach on the 2021 term loan (Counts One, Two, and Three) may proceed. Having found that the interim payment provision is severable, this Court finds that Defendant's counterclaims regarding the 2020 LOC are appropriately dismissed.[6]

### 3. Unjust Enrichment

Plaintiffs argue that the unjust enrichment counterclaim fails because it is entirely duplicative of Defendant's previous counterclaims. In New York, an unjust enrichment and breach of contract claim will not be considered duplicative "where there is a bona fide dispute as to the existence of a contract or the application of a contract in the dispute in issue…" *See Sabre Int'l Sec., Ltd. v. Vulcan Capital Mgmt., Inc.*, 95 A.D.3d 434, 438 (N.Y. App. Div. 2012). Here, because Plaintiffs allege that no contract exists between the parties, Defendant is entitled to plead a cause

---

[5] "EDDW does not dispute that it borrowed money from Defendant pursuant to the LOC and has not paid back the entire balance on that debt." *Id.*

[6] Defendant pled: "*In the alternative*, in the event that the Court determines that the Term Loan Agreement and Term Note are not enforceable, EDDW and BofA were parties to the 2020 Loan Documents, which are valid and enforceable contracts." ECF No. 20 (emphasis added).

of action for unjust enrichment. Importantly, Defendant asserts that it's alternative pleading theory of unjust enrichment should not be the basis for entry of judgment in its favor, but that "the Court may be called upon to equitably enforce a quasi-contract." ECF No. 24-1 at 29.

### C. Defendant's Other Arguments

#### 1. Parol Evidence Rule

The thrust of Defendant's brief centers on its argument that Plaintiffs' entire case fails because it is dependent on inadmissible parol evidence. Where the parties have reduced their agreement to an integrated writing, the parol evidence rule operates to exclude evidence of all prior or contemporaneous negotiations or agreements offered to contradict or modify the terms of their writing. *See, e.g., Marine Midland Bank–Southern v. Thurlow,* 425 N.E.2d 805, 807–08 (1981). ("Although at times this rule may seem to be unjust, 'on the whole it works for good' by allowing a party to a written contract to protect himself from 'perjury, infirmity of memory or the death of witnesses.'" (citations omitted)); *see also Meinrath v. Singer,* 482 F. Supp. 457, 460 (S.D.N.Y. 1979) ("One of the oldest and most settled principles of New York law is that a party may not offer proof of prior oral statements to alter or refute the clear meaning of unambiguous terms of written, integrated contracts to which assent has voluntarily been given") (Weinfeld, J.) (footnote omitted), *aff'd,* 697 F.2d 293 (2d Cir.1982).

However, parol evidence is admissible in support of a well-pleaded claim of fraud in the inducement of a contract. *Centronics Financial Corp. v. El Conquistador,* 573 F.2d 779, 782 (2d Cir. 1978). Regardless of whether there was a merger clause in the written term loan agreement, Plaintiffs have sufficiently pled that there was no meeting of the minds regarding the payment plan provision. The alleged misrepresentations present here are what induced Hays to execute the

contract and caused Plaintiffs' counsel to overlook the unagreed-to provision until after it was signed. Therefore, the fraud exception to the parol evidence rule applies to the case at bar.

### 2. Jury Trial Waiver

Defendant moves to strike Plaintiffs' jury demand based on identical provisions in both the 2021 term loan agreement and the 2020 LOC requiring irrevocable waiver of the right to a jury trial in a proceeding arising out of a dispute over the loan agreement.

When asserted in federal court, the right to a jury trial is governed by federal law. *Owens–Illinois, Inc. v. Lake Shore Land Co.*, 610 F.2d 1185, 1189 (3d Cir. 1979). Although the Seventh Amendment right is fundamental and a presumption exists against waiver, federal courts have consistently enforced contract provisions waiving the right to a jury trial as long as the waiver is knowing, voluntary and intelligent. *See, e.g., Corestates Bank, N.A. v. Signet Bank,* No. Civ. A. 96–3199, 1997 WL 117010, *5 (E.D. Pa. Mar. 13, 1995); *Curtis Center Limited Partnership v. Sumitomo Trust & Banking Co.,* Civ. A. No. 95–1465, 1995 WL 365411 (E.D. Pa. June 15, 1995).

A waiver is knowing, voluntary and intelligent when the facts show that (1) there was no gross disparity in bargaining power between the parties; (2) the parties are sophisticated business entities; (3) the parties had an opportunity to negotiate the contract terms; and (4) the waiver provision was conspicuous. *See Hydramar v. Gen. Dynamics Corp.,* Civ. A. No. 85–1788, 1989 WL 159267, *2 (E.D. Pa. Dec. 29, 1989).

If a plaintiff alleges fraud as a means "to invalidate an otherwise valid jury waiver provision, the allegation of fraud must incorporate an allegation that the jury waiver clause itself was procured by fraudulent means." *Aamco Transmissions, Inc. v. Harris,* No. 89–5533, 1990 WL 83336 (E.D. Pa. June 18, 1990) (citing *Telum, Inc. v. E.F. Hutton Credit Corp.,* 859 F.2d 835, 837–38 (10th Cir. 1988)). A party's "general allegations of fraud, however, do not affect

application of the jury waiver provision and in no way suggest waiver of the right to a jury trial was involuntary or not knowing." *Cottman Transmission Sys. v. McEneany,* 2007 WL 119956, at *3 (E.D. Pa. Jan. 4, 2007).

The jury waivers present in both loan agreements are not vitiated by Plaintiffs' general claim of fraud. Plaintiffs have consistently agreed to waive their right to trial by jury in all their dealings with Defendant. There has been nothing pled to suggest that the jury waiver was not knowingly, intelligently and voluntarily made. The application of the jury waiver provision to the case at bar is not affected by Plaintiffs' fraud claims. Therefore, this Court will enforce the jury waiver and Defendant's motion to strike Plaintiffs' jury demand will be granted.

### III.   CONCLUSION

When considering a motion to dismiss or motion for judgment on the pleadings, a court must take the well-pleaded factual allegations as true, apply a holistic approach, and draw all reasonable inferences in the movant's favor. Following this mandate, the Court denies Defendant's Motion for Judgment on the Pleadings in part, but grants its request to dismiss the conversion and unjust enrichment claims. Additionally, this Court denies Plaintiffs' Motion to Dismiss in part, but grants its motion regarding the 2020 LOC. The Court will also grant Defendant's motion to strike Plaintiffs' jury demand. An appropriate order to follow.

BY THE COURT:

_____
Hon Mia R. Perez